Mr. Clerk, you can call the next case please. Case number 3-090515, In re Marriage of Robert Casares, appellant by Mr. Roy A. Spooko vs. Barbara Casares, half lead by Ms. Victoria Fakai-Kenneson. Mr. Spooko. May it please the court. Ms. Kenneson. Yes. First I'd like to take the opportunity on behalf of Mr. Casares to thank the court for the opportunity to present his argument in this forum. It certainly is for me a unique forum, a little bit different than what we're used to in Ottawa, but nonetheless, our thanks. This is a case about the marriage and dissolution of the marriage of the Casares. They were married on August 17, 1999, had two children, now age 8 and 10. Mr. Casares is a Joliet police officer who earns approximately $80,000 to $85,000 per year. His former spouse at the time of the dissolution was a school cafeteria worker, earning about $11 an hour, but she had previously been employed for 11 years by Harris Casino, earning $18 an hour. The parties were able to resolve their parenting issues prior to the entry of the judgment and amended judgment for dissolution by entering into a joint parenting agreement, which was approved and entered in January of 2007. The final judgment order in the form of an amended judgment for dissolution of marriage was entered in May of 2009. That judgment incorporated the parenting agreement of the parties as a joint parenting order. It divided the marital estate approximately 60% to Mrs. Casares and 40% to Mr. Casares, provided that my client pays $750 a month rehabilitative maintenance for two years, upon which time could be reviewed, that he paid guideline child support in the amount of 28%, which amounted to approximately $1,500 a month, that he pay, in addition to the support, certain obligations in the future and certain obligations that had already been incurred, such as Sylvan Learning Center, the 75% of the cost of Catholic school education, 75% of medical expenses for the children, 75% of all extracurricular expenses. Mrs. Casares was awarded her non-marital pension of about $27,000, half of Mr. Casares' marital pension. She was awarded a contribution of $17,000 towards attorney's fees, and she was awarded a cash equivalent of Mr. Casares' comp time from his employment as a police officer, and awarded 28% of the net on all future accumulated comp time. Mr. Casares is before this court, and as we set out in our brief, disputing both the disproportionate division of the marital estate, as well as the court's inclusion of certain of the assets in that marital estate. We also contest the valuations on certain of the assets that the court decided in its findings, and we dispute the disproportionate division of the items that Mr. Casares was ordered to pay in addition to guideline support. The last disputed issue that we have presented in our brief is Mr. Casares' order to pay certain of the expenses at all in this case. As this court is well aware, and as we set forth in our brief, the first decision that the trial court must make in the conclusion case with respect to the division of the marital estate is whether the assets are marital or non-marital. Two of the assets that the court decided were marital, we believe quite clearly were not. The first of those is the compensatory time that Mr. Casares had accrued through his employment as a Joliet police officer. As we set out in detail in our brief, Mr. Casares was allowed to work certain overtime hours, and instead of being paid time and a half, he was able to accumulate compensatory time, which would allow him to take time off in the future and be paid for that time as if he were working. For example, if he accumulated five hours of compensatory time, he would be paid time and a half. That's overtime. He'd be paid time and a half. Or if he chose not to be paid, he would get seven and a half hours of regular time off of work, for which he would be paid when he exercised that time. The court found that this was marital in nature, even though Mr. Casares had accumulated all of the time prior to the time that the case was tried and ordered a computation of 28% of the net income that would be or could be derived from that compensatory time and awarded 60% of that to Mrs. Casares. At the time we filed our brief, a very similar issue, completely analogous to compensatory time, was pending and under advisement in the Supreme Court. The Fourth District had determined that vacation and sick pay time was not a marital asset and not includable in the marital estate for division. In the case of Abrell, A-B-R-E-L-L, set forth in our brief, the Supreme Court affirmed the appellate court, the Fourth District appellate court, and determined that vacation and sick pay were not includable in the marital estate. The analysis that Justice Thomas set forth in that opinion clearly sets forth the court's reasoning that this was an accrued vacation and sick days were speculative and uncertain until a party actually collects the compensation. The evidence at trial and the argument in our brief sets forth clearly that until Mr. Casares leaves employment, he cannot cash out the comp time. Just as in the Abrell case, the vacation and sick pay were not cashed out, could not be cashed out until the party had left employment. The analysis is the same. We urge the court to, although this apparently is a matter of first impression before the court, we urge the court to adopt the decision in Abrell, applying it to the deferred compensation. To rule otherwise would be to allow a double dipping. The court additionally ordered that Mr. Casares be responsible for 28% of any future comp time that he accrued in addition to his regular support. With the way that the comp time works when it's exercised, it would be includable in his income in any event. If his union happened to change the rules and he lost the comp time, he would have prepaid it. Allowing the trial court's ruling to stand would mean that he was paying 28% of his net income from his employment and in addition to that, paying 28% of the comp time that he accrued prior to receiving it as income. Certainly Mrs. Casares would not be prejudiced by merely getting her percentage of that when it was received. Counsel, I have a question on the comp time issue. Is there an election that your client can make at the time he works the overtime hours? Can he elect to be paid or elect to receive compensation time? Yes. And so the election to receive compensation time instead of overtime pay was actually exercised during the course of the marriage? It was not to receive, I'm sorry, to receive. I'm just wondering, does he have the right to elect whether he receives overtime pay at the time he works overtime? As it's accrued, yes, he does. He can elect to be paid or to comp time it? Yes. And so the elections in this case he made during the course of the marriage. The petition for dissolution was filed in 2006. The marriage was not dissolved until 2009. And so the comp time we're talking about, much of it occurred, the election occurred to receive compensation time during the time when he was married. Well, all of the comp time, yes, the election was made during the marriage and all of it was accrued prior to the time that the case went to trial. There was no order requiring Mr. Caceres not to make that election during the marriage. He was paid for all of the hours he worked. He paid support based on the income that he got. So when he exercises those, if he does exercise those comp times, he will be paid for the period of time that he doesn't work, so there will be no interruption in support. Did the court also use that comp time calculation for child support purposes? Yes. Are you challenging that as well? It ordered that that calculation be made in addition to regular child support in the future, but as far as the determination that was made in the trial court with respect to the already accumulated comp time was that it was an asset, that it was a marital asset. That it was property as opposed to income. That it was property, correct. It was not future income, it was property. When there was no present right, Mr. Caceres had to convert that to cash. So when the court orders that he has to pay $4,000, it's a fiction. That money doesn't exist. He has to get it from somewhere else. I have another question based on procedure. You talked about the amended judgment, which was stated May 28th of 2009, and it is included in the appendix to your brief. But I don't understand what the original date of judgment was, and I've searched the record and cannot find an original date of judgment. There was a judgment presented that did not dispose of all the issues. Was it signed by the judge? No, it was not. The amended judgment was the one that was signed by the judge. So the amended judgment is the first order that the judge signed? Yes, that was fully dispositive of the assets, yes. It was the final appeal of judgment in the case. Okay, because to me, in my mind, when I see an amended judgment, then I start looking for the original one that you've amended. The first order is May 28th of 2009? The judge gave his decision. A proposed judgment was prepared. Objections were made. The court ruled on those objections. An amended judgment that incorporated the clarifications that the court made was prepared and entered. That helps me. Thank you. Thank you. The other asset that we allege was mischaracterized by the court were the weapons that were awarded to Mr. Caceres in this case. And I won't dwell on this. It's set out in our brief. But the only testimony that was presented regarding the marital versus non-marital nature of those weapons was that Mr. Caceres testified that he purchased two of the 12 weapons during the course of the marriage, and it's undisputed that those were marital property. Those were valued at approximately $1,400. Yet in the judge's decision, he included $5,000 worth of weapons in the marital estate and made a misstatement as to a mischaracterization of what the testimony was, and we discuss that in our brief. But I think quite clearly only two of the weapons were marital and should have been included in the marital estate. Because of time constraints, I just want to make sure that the court knows exactly where we're coming from here. This was a disproportionate division of the marital estate, 60-40. In addition to that, despite the fact that there was ample evidence that Mrs. Caceres was certainly able to earn a more substantial income than she was making, maintenance was awarded. But if you look at what the division of this marital estate was, it really wasn't 60-40. If the court properly includes only the items that should have been in the marital estate and eliminates the items that weren't, even if Mr. Caceres, even if the court's calculations were correct, if you determine that Mr. Caceres was paying $17,000 out of his portion of the marital estate on behalf of Mrs. Caceres for attorney's fees, if you add back in the ordered payment to Sylvan Learning Center, which we argue should not have been ordered because there was no agreement that was covered by the parenting agreement, should not have been ordered. If you add back in the cash value of the life insurance, if you add back in the other items that Mr. Caceres was ordered to pay, the $4,000 for the comp time, if you add back these things into the wife's portion of the marital estate, subtracting from his, he gets zero. His portion of the marital estate, the net marital estate, is zero. Your time is up. Just to conclude, as we set forth in our brief, there are issues with respect to values. There are issues with respect to the nature. There are issues with respect to the order that these children be raised as Catholics. They're clearly contrary to the manifest way to the evidence beyond the discretion of the trial court. We ask the court to repair this injustice. Thank you. Thank you, Mr. Spooko. And Ms. Kenneson. Thank you. May it please the court, Mr. Spooko? Yes. I'm here on behalf of Barbara Caceres, the defendant in this matter. As the panel has been previously advised of the basic background of this matter, I will not get into, again, specific details except to supplement where I feel necessary in response to the argument made by Mr. Spooko. Briefly, the first issue that was raised by Mr. Spooko on the compensatory time, we believe that this is clearly an issue of first impression before the court. There was, in fact, a similar issue pending at the time that the Appellant's brief was filed, and subsequently the Illinois Supreme Court did rule, as Mr. Spooko has previously addressed, and the Addrell matter, that case deals with the issue of whether or not sick and or vacation time is to be considered marital property. While it may be slightly similar, it is not an exact application to this case. Clearly, given the collective bargaining agreement that was attached to the Appellant's brief, it sets forth that sick and vacation time is something that is not within the plaintiff's control as to how or when he will receive compensation for that. But when he chose to bank that time during the, actually to lead up to the dissolution, I think, didn't that take it out of an exception to Addrell? Didn't that put it back into that category? I mean, whether it was a thing that he did for reasons that your client wouldn't approve of, if he had the choice, after he did it, didn't that place it into the category of a sick or vacation day then? Because he didn't have access at that point. Justice, that would be correct, except I believe it would be blindly applying Addrell. If you look at it only from that standpoint, you ignore the fact that the husband in this case voluntarily chose to convert his overtime to comp time. He had the ability not to, and that's an important distinction from what the Illinois Supreme Court addressed. There was no choice. There was no ability to say, I choose to accept direct pay for my sick time or my vacation time. They had to wait until their employment was terminated or retirement. In this case, it's critical to consider that distinction. Mr. Kaceres knew full well what he was doing when he rolled over his overtime into comp time. At what point in time did he do that? It's my understanding that for a number of years before the divorce commenced, but that's how he was treating his overtime pay. He was elected to have it be used as comp time rather than as overtime pay. He did that for a number of years, or was that just an anticipation of the divorce? I believe that was an anticipation of the divorce, Justice. I will tell you that I was not trial counsel, and all I can tell from the record from what I've seen is that it was a clear decision to do all of his overtime, roll it into comp, from after the petition for divorce was filed. But I cannot speak to before. Do you think that that should make a difference in how we look at what he did or what happened? I would suggest that in this case we should give the deference to the trial court. The trial court heard all the evidence, saw all the witnesses, and clearly in line with other decisions that were made, I believe that the court found as a credibility issue that Mr. Caceres intentionally, for motives that were not necessarily the purest, rolled them over into the comp time as opposed to taking them directly. He knew exactly what he was doing, and he was, just as trial counsel argued in his closing argument, by doing this he denied additional child support. And so in addition to that, I believe Counselor Mr. Sabuco was arguing that it was not fair for the trial court to find that the comp time was marital property subject to division, but then also to say that 28% of any additional comp time after the divorce should be child support. I don't agree with that at all. I think it's very clear under the statute, under Section 505, when you're looking at setting child support, you have to have child support based on total income minus certain factors that are set out, minus taxes, minus mandatory contributions to retirement, not voluntary contributions to retirement. Now obviously we're not talking about retirement, but I think the analogy is similar here. Comp time, in this case, with these parties, this individual had a collective bargaining agreement that clearly gave him the voluntary option to take his pay when he earned the overtime or to roll it into comp time. And so it's not mandatory, it's voluntary. So therefore, being a voluntary choice, it should be subject, any future comp time should be subject to child support. And as a further note to that, I believe counsel was asked if he was appealing that issue, and he's not. He has not raised that in his brief. He did not challenge the issue of the setting of child support or the fact that any future comp time would be subjected to child support. Now, counsel also contests the allocation or the valuation of Mr. Casares' weapons. He is a police officer with the city of Joliet. At the time of the trial, he testified that he had seven firearms, two of which he claimed to be marital, leaving non-marital five. In the wife's trial memorandum that was submitted to the court and is entered in the record, she said that the husband had seven marital firearms and valued those firearms at $5,000. At trial, there was a defendant's exhibit that was used that the trial court apparently relied upon in which the exhibit shows 12 separate firearms owned by Mr. Casares. And so I believe there's ample support in the record to support the trial court's finding of the valuation and the number of the firearms. Again, the trial court considered all the evidence, heard the testimony, and as I think was the main theme throughout this case was the issue of credibility. The trial court did not believe Mr. Casares. There was evidence to support his findings, and for those reasons, his findings should not be overturned. And we'd ask the court to find that that was not an abuse of discretion. Now, the issue on the Sylvan's learning tuition, in the joint parenting agreement that the parties entered into in January of 2007, it set forth that the parties were to have joint custody with the wife as the residential parent. And we know that, pursuant to Section 608 of the Illinois Marriage and Disillusionment Marriage Act, that the custodian, absent a finding of the court that without a specific restriction on her ability to make determinations regarding the children's upbringing, including education, including religious training, that the custodian should be permitted to make those necessary decisions. Now, in the joint parenting agreement, it provided that the parties were to consult with one another and try to share that responsibility. In this case, clearly, the parties had a dispute. The wife wanted to raise the children, continue to raise the children in the Catholic religion, which apparently had been something that she testified that the parties had originally agreed upon. Both Mr. and Mrs. Casares were raised in the Catholic faith. Mr. Casares went to a Catholic grade school. The children were baptized in the Catholic religion. And so this was something that I would submit to the court, which is a continuation of an already ongoing practice. And Mr. Casares coming in at trial saying that he did not agree, he wanted to raise the children under the Lutheran doctrine, clearly created the dispute. And obviously, given the late time and the issues all pending for the court on trial, the judge and the parties agreed to waive mediation. So there was no issue of mediation. It was all going to be decided right then and there. It would be expedient and efficient. And the trial court ruled that the children could, in fact, be raised as Catholics. There is nothing in the judgment, nothing in the court's decision to indicate that there's any restriction whatsoever under Section 607 of the Illinois Marriage and Disillusionment Marriage Act preventing Mr. Casares from exposing his children to any other religion that he wishes to. During his visitation time, he can, as deems appropriate, take them to the Lutheran church if he so wishes. That was expressed clearly by Mrs. Casares' counsel to the trial court. It was, again, acknowledged in our briefs. And again, here today, we're saying we have no issue with Mr. Casares taking the children to any other church he wishes to during visitation. We simply had asked the court to permit her to continue to raise them in the Catholic church. Now, in regards to the Sylvans bill, as noted in our brief, the party's oldest son, who at the time of trial was approximately 8 1⁄2 years of age, had significant special needs. His attention deficit disorder, he had pervasive development delay, and he also was possibly bipolar. He was on medication, daily medication. He was under the care and treatment of psychologists, psychiatrists, social workers. This was a young child that needed intensive care, extensive care in terms of these medical issues. And as indicated in the letter written from his pediatrician, the doctor was supporting the wife's decision to be available to the child after school, that even if necessary, if it needed to limit her ability to work, she needed to be there to care for this child. All of these facts were not in Mr. Casares' brief. He wants to argue that somehow it's improper, the disproportionate or greater share in the marital assets to the wife. Somehow maintenance is not appropriate, even though, again, in his brief, he argues to the court that the trial ordered two years of maintenance without mentioning that it was rehabilitative, without mentioning the special needs and the reasons why the wife needed to be home and working reasonable hours. In addition, Mrs. Casares has depression that she's suffered since the birth of their first child that she's on medication for. But she was of a good age, 40 years old, but only in high school education. At the time of the trial, she had just recently been able to find employment that provided her the opportunity to work hours that would enable her to be home to care for Bobby, working at a school district. I'm sorry, can I get back to the Sylvan school issue? Now, I understand that she felt the need to improve his scholastic abilities by doing this, and as the custodial parent, she had the right and responsibility, the first right, maybe primary right, I guess, to guide the education of the child, but this was a special thing, and she knew it was going to be worth $1,900 additional cost, and she told him about it, and she invited him, and he came to a meeting prior to that, to the school starting. And they left the meeting, she said, this is a good thing, we're going to do it, and he said, I'm not sure if that's a quote, but something like, it's a crock, and I'm not for it. She went ahead and did it, and then the trial court made him pay for a substantial portion of that $1,900. Yes. Under the joint parenting agreement, did she do enough, in your opinion, to consult? Justice, I And what does consult mean in this context? I mean, you know, there are other requirements in the joint parenting agreement. I believe in this case, Judge, and maybe perhaps from my experience working in the family law for 14 years, I've seen lots of disputes that arise between the parties during the pendency of divorce proceedings, and a short answer to your question, Justice, is I believe she did appropriately consult him. And the reason I say that is, in most cases where somebody's objecting to a lack of notice, a lack of knowledge, an inability to participate pursuant to the terms of the joint parenting agreement, it's in a situation where, let's say mom took the child to Sylvan's Learning Center, never even told father, he had no idea, all of a sudden he finds out two months later when the child just happens to mention, oh, by the way, I just took a test, and I have some more homework to do for this tomorrow. Or all of a sudden, here's a bill, a bill that's just dropped off, and the father now is expected to pay that. That would clearly be a lack of proper consulting, a lack of proper notice, an inability to consult. So in this case, I do think as we set forth in our brief that not only was he aware of Sylvan's, aware of the special needs of his son, aware that the mother wanted this, he was actually taken. The two of them went together to the center. He got an opportunity to see everything, to talk to everybody, to know what the costs were, to know what the obligations were going to be, and know that she had said, yes, I want to do this. And if he was disputing it, again, under Section 608 of the Illinois Marriage and Dissolution of Marriage Act, it was incumbent upon him to file a motion before the trial court to seek some prohibition or injunction to stop her from doing this thing. So the burden was on him to stop the course or to get some determination as to who was going to pay what then? That's what I would submit. And, of course, there was, again, the joint parenting agreement, and I'm not exactly sure at what time this bill of Sylvan's came up, because if he was objecting and was going to carry through on his objection, he should have put it in writing, sent it to counsel. They would have done a motion. They would have said, let's go to mediation first. There would have been something, but since there's none of that in the record, it appears that he knew about it, he participated in the initial visits to Sylvan's, did nothing, and waited to the time of trial when the issue was resolved by the trial court. So, again, for all these reasons, the other issues that I have not had an opportunity to get to, I would just ask the court to respectfully consider our response brief. I believe everything is laid out there sufficiently. And, again, to submit to the court that, in this case, it was a question of credibility. Clearly, the husband was earning five times, almost five times as much income as the wife, given her limited ability to earn both present and future income, the needs of the child for her to be home and be available, and the husband's continuing ability to earn very substantial good income warrants that the trial court's decision be affirmed. There was no abuse of discretion in this case. Thank you. Thank you, Ms. Kinnison. Mr. Sabuco, any rebuttal? Thank you. With respect to Ms. Kinnison's statement that the inclusion of the comp time in the marital estate was some type of subterfuge on the part of Mr. Caceres to limit his ability to, or Mrs. Caceres' ability to collect support, is not substantiated by anything in the record. This was a longstanding policy that Mr. Caceres works in a job where he could be incapacitated. This simply allows him to continue to earn money and support his family and his children during periods of time where he is not working. It doesn't diminish his income because it's paid when it's used. It's a pure fiction to say that there was a fund of money available to divide up as part of the marital estate. The Abrel case, which was decided and discussed in our reply brief, goes into detail, a very detailed analysis beginning on page 14. Justice Thomas refutes all of the arguments that were raised with respect to the sick pay and vacation issue that was before the court there. Encourage the court to adopt that reasoning. With respect to the weapons and whether they were includable, the record was defendant's exhibit. Mrs. Caceres' exhibit 7, for some reason, was not transmitted to the court. By agreement and with the permission of the court, the record was supplemented, and defendant's exhibit 7 is now part of the record. In that exhibit, the dates of the purchase of all the weapons are included, and only two of the weapons were purchased during the marriage. All of the others were prior to the marriage, clearly prior to the marriage, clearly non-marital. So the judge's determination that that property awarded to Mr. Caceres was valued at $5,000 has no basis in the record. The total value of all of the weapons, all 12 of the weapons, was only $4,400. The two marital weapons, $1,400. The parenting agreement in this case should be dispositive of at least two of the other issues. Page 6 of the parenting agreement, which is also in the appendix to our brief, The parties further agree that they shall equally share the responsibility of making necessary parental determinations relating to the place and form of the child's education, religion, and all other areas in which parental direction, consent, or guidance may be required or sought. They further agree that they will equally share the responsibility of making those decisions. Religion. They did not agree on Catholicism. Mr. Caceres had objections to that. The court ordered it. The court usurped the parenting abilities of these two people to raise their children in a religion that they wanted by ordering that the children be raised Catholic. That same paragraph also... The joint parenting agreement, I mean, it encourages people to talk, to work things out, to come to a decision. When that doesn't happen, the judge has to take over, doesn't it? I mean, the judge doesn't say take over. The judge has to make that decision. The judge has to make a decision. I mean, if they enter into mediation and try to work it out, try to come to an understanding that they both agree with, that's fine. But if it doesn't happen, isn't the court literally the court of last resort? On some issues, yes, I would agree with you, Justice, but on certain issues, no. Religion, like politics, is the right of the individual. When children can't make that decision, it's the right of the parents to make the determination. But, counsel, didn't your client agree to allow the judge to make that decision? Absolutely not. During the course of the dissolution proceedings, there was testimony, and then the parties waived mediation and submitted that question to the court by agreement. Mrs. Caceres had filed a motion to vacate that portion of the parenting agreement. In the judge's decision, he denied that, which leaves the parenting agreement intact. The parenting agreement states that they shall equally share the responsibility. It doesn't give one or the other the right to make that determination. If neither parent has taken the responsibility as part of the parenting agreement, I don't believe that the court has the authority to order the parents to make that decision with respect to religion. Hadn't the decision to baptize these children and to enter them into Catholic training started before their divorce proceeding was ever begun? Yes, it had. And at that point, or at the beginning, are you saying that he never agreed that they should be raised Catholic, or he changed his mind at some point? He changed his mind at some point, and it was based, the record will reflect, that it was based primarily on the abuse issues within the Catholic Church, and he felt that the children would be better raised in Lutheran faith, which was close to Catholicism, but yet had not been burdened by the issues of abuse. I have one question on the Sylvan education issue. Yes. Ms. Kennison says that it was your client's responsibility then, when you disagreed with putting the child through that program, to go to court and get relief there then, I'm guessing through an injunctive proceeding. What is your take on that? Well, Your Honor, I heard her say that, but I don't know what it's based on. What would your position on that be? My position is that the parties had agreed to consult on issues impacting on education. They did, in fact, consult, but there was no agreement reached. That does not give either party the right to make a unilateral decision and incur an expense and then seek contribution, and in this case, contribution was ordered at 75 percent of the amount, from the other side. The Minnix case and the Van Nortwood case, the second district case that we cite in our brief, is directly on point. You can't make that unilateral decision. If there's a dispute, the burden would be on the parties seeking to incur the expense to get a determination of whether it should be incurred and whether the other side is going to contribute. That wasn't done in this case. It was a fait accompli. The bill was presented. I want you to contribute, and eventually it was ordered that he contribute 75 percent. All right. Well, thank you very much. I have a question. I'm sorry. But that bill was incurred before the final dissolution. It was. A question on the election to roll over the 394 hours of overtime. Ms. Kinson speaks as though there was a singular decision to do that. Is that your understanding of the record, that during the separation, for the first time, husband decided to roll over his accrued overtime into a comp time account? That election is made as the overtime is earned. I would think weekly, biweekly, monthly, however he's paid. Whenever the overtime has worked, you can make an election to have that go into comp time or to be paid time and a half. So it was over a course of time. Is there something in the record that will allow us to be able to determine whether Ms. Kinson's statement that it was once a rollover during the course of the separation or it occurred during, as compensation accrued, is there something that I can go to in the record, an exhibit, that will help me with this? There is not. Testimony? Well, I believe that there is an exhibit that shows the periods of time that the comp time was accrued. I likewise was not trial counsel, but from our review of the record, these 390, obviously that had to occur over a lengthy period of time since it was all overtime. Thank you. And thank you both for your argument today. We do appreciate it. And I should mention that both counsel here in this case hail from the Joliet area, so they drove quite a ways to be here and to argue this case in front of you in Peoria. So we thank them particularly for that and for their efforts. Thank you. We will take this case under advisement and get back to you with a written disposition within a short time.